IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUBEN MONCADA, et al,<br><br>    Plaintiff,<br><br>vs.<br><br>PETROLEUM GEO-SERVICES, et al,<br><br>    Defendants. | Case No. 1:11-cv-1352 AWI JLT<br><br>FINDINGS AND RECOMMENDATIONS GRANTING PLAINTIFF'S MOTION TO REMAND THE MATTER TO THE KERN COUNTY SUPERIOR COURT AND TO DISMISS THE MATTER<br><br>(Doc. 18) |

Plaintiffs move for an order remanding this case to the Kern County Superior Court. (Doc. 18). Plaintiffs argue this case should be remanded because Defendants Petroleum Geo-Services ("PGS") and Geokinetics, Inc., failed to demonstrate that $5,000,000 is in controversy as required by the Class Action Fairness Act of 2005. Defendants oppose the motion.[1] (Doc. 18).

After reviewing the moving and opposing papers and hearing the argument of counsel, the Court recommends the motion to remand be **GRANTED**.

**I.   BACKGROUND**

Plaintiffs are a group of employees who work, or worked, on jobs involving seismic inspection in Kern County and elsewhere. (Doc. 18 at 3) Initially, the named Plaintiffs worked for PGS but when the company was acquired by Geokinetics in April 2010, their employment was continued by Geokinetics. Plaintiffs brought this class action on behalf of two subclasses of employees: those who

---

[1] Plaintiffs do not contest the existence of minimal diversity as provided for under 28 U.S.C. § 1332(d)(2).

1

worked for PGS from June of 2009 to April 2010 and those employees who worked for Geokinetics as of April 2010.

As to Defendant PGS, Plaintiffs allege that they and other employees worked over ten hours a day, seven days a week and were assigned to work this schedule over "several weeks" before being provided "one to two weeks" off. (Doc. 1-1 at 13). From June 2009 until April 2010, Plaintiffs allege that PGS violated various sections of California Labor Code by: (1) failing to provide meal and rest breaks during shifts of more than ten hours; (2) failing to pay employees for missed meal and rest breaks as well as for earned double time pay (ie. more than 12 hours per day or more than eight hours on the seventh consecutive day of work); (3) failing to provide employees with "accurate" itemized statements. (Id. at 13-14)

Likewise, Plaintiffs contend that Geokinetics maintained a similar schedule and violated state wage-and-hour law by: (1) failing to provide meal and rest breaks and then failing to pay for these missed breaks; and (2) failing to pay its employees for all wages due at termination. (Doc. 1-1 at 13). Additionally, Plaintiffs allege that Defendants' conduct (as to both subclasses) resulted in violations of the state's Business and Professions Code §§ 17200, et seq. (Id. at 16-17).

## II.   LEGAL STANDARD

CAFA "vests district courts with 'original jurisdiction [over] any civil action in which, inter alia, the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs,' and in which the aggregate number of proposed plaintiffs is 100 or greater, and any member of the plaintiff class is a citizen of a state different from any defendant." Lowdermilk v. U.S. Bank Nat'l Ass'n, 479 F.3d 994, 997 (9th Cir. 2007) quoting 28 U.S.C. § 1332(d)(2).

A court's removal jurisdiction must be analyzed on the basis of the pleadings at the time of removal. Sparta Surgical Corp. v. National Ass'n of Sec. Dealers, 159 F.3d 1209, 1213 (9th Cir.1998). Generally, courts must construe the removal statutes strictly against removal and resolve any uncertainty in favor of remanding the case to state court. Takeda v. Northwestern Nat'l. Life Ins. Co., 765 F.2d 815, 818 (9th Cir. 1985). "Where the complaint does not specify the amount of damages sought, the removing defendant must prove by a preponderance of the evidence that the amount in controversy requirement has been met." Abrego Abrego v. The Dow Chem. Co., 443 F.3d 676, 683 (9th Cir.2006).

2

"Under this burden, the defendant must provide evidence that it is 'more likely than not' that the amount in controversy" satisfies the jurisdictional amount requirement. Sanchez v. Monumental Life Ins. Co., 102 F.3d 398, 404 (9th Cir. 1996). If the complaint is silent on the amount of damages claimed, "the court may consider facts in the removed petition and may 'require the parties to submit summary-judgment type evidence relevant to the amount in controversy at the time of removal.'" Singer v. State Farm Mut. Auto. Ins. Co., 116 F.3d 373, 377 (9th Cir. 1997). A court may not base its jurisdiction on speculation and conjecture. Lowdermilk, 479 F.3d at 1002.

## III.   DISCUSSION

### A.   Defendants' Determination of the Amount in Controversy

Plaintiffs' complaint does not allege a specific amount in controversy; therefore Defendants provide the declaration of Brenda Taquino, the Director of Human Resources for Geokinetics to assist in damage calculations. (Doc. 22 at 19-22).

Ms. Taqunio attests that she has access to the employment records of Geokinetics and of "certain personnel and payroll records" for PGS for the relevant period. Id. at 20. Based on her review of Defendants' records, Ms. Taquino declares that "between June 2009 and the present, approximately 150 individuals have worked or are working in California as non-exempt employees for PGS and/or Geokinetics." (Id. at 3). Ms. Taquino's declaration sets forth the hourly wage rate for each of the representative Plaintiffs and the number of days each Plaintiff worked for both PGS and Geokinetics. (Id. at 2-3). These include hourly rates of $9.50, $9.00, and $11.25 for Plaintiffs Moncada, Ortega, and Nava respectively. For Plaintiff Guzman, PGS paid him an hourly rate of $9.25 while Geokinetics paid Guzman $9.25 for 88 work days[2] and $9.75 for 160 work days. (Id. at 2-3). Based upon these figures, Defendants assumed that the average hourly wage for the absent class members was $9.80.

Ms. Taquino does not set forth the number of employees currently employed by Geokinetics who

---

[2]Interestingly, despite that Defendants were unwilling to review the PGS paper records to gather accurate information for the damage calculation (see fn. 3 below), clearly they reviewed the records at least to gather the named Plaintiffs' rates of pay and to determine the number of total employees employed by both companies during the relevant time period.

3

are putative class members.[3] She fails to provide the number of putative class member-employees hired by Geokinetics after it acquired PGS, or when they were hired. Likewise, she does not provide any information as to the hourly rate earned by the current employees nor does she offer any information about whether the average hourly rate earned by the four named Plaintiffs is a reasonable estimation for the average hourly pay earned by the class.

### 1. Defendants' Estimate of Damages for the "Double Time" violations

To calculate an estimate of the damages for the "Double Time" violations, Defendants assume that each named Plaintiff worked 38 out of the possible 48[4], 7-day work weeks during the period from June 2009 through April 2010. (Doc. 1 at 6). In addition, Defendants assumed that PGS failed to pay each Plaintiff one hour of double time pay for each day worked. Defendants then multiplied the respective hourly rates for each Plaintiff, (doubled for the double time pay) by 266 days, (the total number of days in the assumed 38-week period that Plaintiffs had worked for PGS) and then doubled this figure to account for the liquidated damages available pursuant to the Labor Code. (Id. at 5-6.) Defendants then estimated that $10,374 was the damage amount for each putative class member for the "double time" violation, by averaging the total amount calculated for the four Plaintiffs. (Doc. 22 at 7).

### 2. Defendants' Estimate of Damages for the meal and rest period violations

Defendants made similar assumptions and calculations for the alleged meal and rest period violations. For both violations, Defendants multiplied one hour of extra compensation by the hourly wage earned by each named Plaintiff and by the number of days that each named Plaintiff worked for PGS and Geokinetics. (Doc. 22 at 11-13). Defendants then averaged the amounts to determine that each single class member's damages were $4,358.50 for the meal violation and $4,358.50 for the rest violation. (Id.)

///

---

[3] At the hearing, Geokinetics' counsel explained that the payroll and personnel records obtained from PGS were in paper form and that Defendants did not review the paper records to obtain accurate information. Moreover, counsel explained that because they did not gather accurate PGS information, to be consistent, they decided not to provide accurate information for Geokinetics' employees, despite that this information was readily available.

[4] To total 48 weeks, each of the weeks beginning the first week of June 2009 through the last week of April 2010 had to have been counted. If this is true, the Court is uncertain how the allegation that the employees began working for Geokinetics in April 2010–rather than May 2010– can also be true.

4

### 3. Defendants' Estimate of Penalties for failing to pay amounts due on termination or "waiting time" violations

Defendants calculated the "waiting time" violation penalty, pursuant to the Labor Code, by multiplying thirty days of wages by the hourly wage for each named Plaintiff's hourly wages, and then averaging these four amounts to arrive at an estimate for this penalty of $3,600 for each putative class member. (Doc. 22 at 13).

### 4. Defendants' Estimates for the total amount in controversy

Adding the totals gathered above with a $4,000 penalty assessed for failing to provide itemized wage statements, Defendants calculated a per class member damage/penalty award of $26,691 ($10,374 + $4,358.50 + 4,358.50 + $3,600 + $4,000 = $26,691). (Id. at 14, 15).

Throughout the above calculations, Defendants contended that their assumptions were reasonable because the complaint alleges that Plaintiffs' claims were "typical" of those in the class. (Doc. 1 at 10). For the same reason, Defendants assumed that each class member worked throughout the entire class period, thus working for both PGS and Geokinetics. (Doc. 1 at 7-8). Based on these additional assumptions, Defendants then multiplied the above $26,691 figure by 150 employees to arrive at an estimated amount of $4,003,650 for class-wide liability. (Doc. 1 at 10). By adding 25 percent for attorneys' fees, Defendants' notice of removal stated that the total amount in controversy was $5,204,745. (Id. at 10).

In its opposition, Defendants claimed an additional $8,717 for each of the 150 class members for the value of possible injunctive relief, or an additional $1,307,550. (Doc. 22 at 14).

### B. Plaintiffs' Determination of the Amount in Controversy

For their part, Plaintiffs dispute the validity of Defendants' assumptions. First, Plaintiffs provide evidence that not all of the absent class members worked for both Geokinetics and PGS. (Doc. 18 at 11) They note that, though Ms. Taquino reviewed the employment records to determine the size of the class–150 people–she does not attest that all of these people worked for both PGS and Geokinetics. (Doc. 22 at 20) Plaintiffs present declarations demonstrating that other class members did not work during the entire class period. (Doc. 18-2 at 1; 18-4 at 1; 18-5 at 1; 18-7 at 2; 18-8 at 2) Moreover, Plaintiffs provide a declaration of their counsel in which he attests that Defendants' counsel admitted

5

that 44 employees had worked only for Geokinetics. (Doc. 18-6 at 3) Indeed, at the hearing, counsel for Geokinetics admitted that 44 employees did not work for PGS at all.

Likewise, Plaintiffs dispute the average hourly rate used by Defendants and present evidence, demonstrating that some of the employees earned far less. (Doc. 18-1 at 1; 18-2 at 2; 18-3 at 1; 18-4 at 1; 18-5 at 1; 18-8 at 1) They disagree also with the assumption that every employee worked for the Defendants for the same amount of time and argue that even those who worked for PGS and Geokinetics, did not necessarily work during the entire class period.

**B.     Analysis**

As an initial matter, the Court notes that except for the lone declaration of Ms. Taquino, Defendants have submitted no other evidence in support of the jurisdictional allegations under CAFA.[5] The Court finds this evidence to be deficient. For example, though Ms. Taquino's declaration provides the hourly wage rates for each of the named Plaintiffs, Defendants have not provided any evidence to support their allegations that the average hourly wages of the four named Plaintiffs (ranging in hourly rates from $9.00 to $11.00) are representative of the average hourly wage of the class members. In contrast, Plaintiffs have attached declarations of six former employees whose hourly pay rates ranged from between $7.50 to $8.75 per hour. (Doc. 18-1-5, 8). Defendants have not countered this evidence except to deride it as being "selective" evidence and implying that it is not a representative sample. However, Defendants had the burden of proof but failed to support their derision with evidence.

On the other hand, many of Defendants remaining assumptions are also unsupported. For example, Defendants have failed to provide evidence that all of the 150 class members worked for both PGS and Geokinetics. (Doc. 18 at 11-13). In contrast, Plaintiffs' declaration of its counsel, Mr. Newman indicates opposing defense counsel previously represented that 44 of the class members had worked for Geokinetics alone and counsel for Geokinetics did not dispute this. (Doc. 18-6 at 3). According to Plaintiffs' estimates, this potential error means Defendants overestimated the number of days worked for each of these 44 class members by a total of 266 days resulting in a combine error of

---

[5] Defendants additionally filed the Declaration of Gregory V. Mersol to clarify a conversation occurring between Mr. Mersol and Plaintiffs' counsel regarding whether attorney's fees under CAFA should be added to the amount in controversy. (Doc. 22-1 at 2-3). However, Plaintiffs now appear to concede that attorney's fees may be considered in determining CAFA's jurisdictional amount in controversy. (Doc. 28 at 7)

6

$875,644. (Doc. 18 at 12). Defendants have failed to respond to Plaintiffs' argument or otherwise indicate how many class members worked for both PGS or Geokinetics, or for only one of the two companies.

As noted above, Geokinetics argued at hearing that they were entitled to rely upon the factual allegations in the complaint, though they admitted that they are relying upon inferences that may be drawn based upon their interpretation of the complaint. They argued that they did not intend or understand that Plaintiffs or the Court would rely upon their figures and that they did not appreciate they were obligated to present accurate figures. On the other hand, the Court is most concerned that even if Defendants intended the figures only to be an approximation of the amount in controversy, Defendants proceeded with assumptions *that they knew to be unsound*.

For example, when calculating the value of the injunctive relief, Defendants multiplied their damage figure $8,717 by 150 employees rather than limiting this calculation to the number of those employed at the time Plaintiffs filed suit. (Doc. 22 at 15). Dukes v. Walmart Inc., 509 F.3d 1168, 1189 (2007) (finding those class members "who were no longer Wal-mart employees at the time Plaintiffs' complaint was filed" would not possess standing to pursue injunctive relief as they would not benefit from the injunction).[6] Again, counsel admitted at hearing that an accurate figure was readily available and had no explanation for the failure to use it.

Finally, whether attorneys' fees may be added to the damage figure to determine the amount in controversy is of no assistance here. Lowdermilk, 479 F.3d at 1000 (holding that attorney's fees may be considered in a court's determination of the amount where the award of fees is authorized by statute. Defendants' estimate of the attorneys' fees is based upon a percentage of their estimated damages and penalties numbers and those figures were derived from unsupported assumptions. Thus, Defendants' calculation of the attorneys' fees is similarly flawed.

### C. Conclusion

After reviewing the record available in this case, the Court finds that Defendants' assumptions regarding the hourly wages of the class members, the respective size of each subclass, and the value of

---

[6] Defendants could avoid the penalty for meal break violations by simply providing the 30 minute unpaid break required by law which would result in no loss to Defendants. Though this would translate into a loss of productivity, it is not clear why Defendants believe that this loss in productivity should be included in the damages calculation.

7

the proposed injunctive relief are not supported by reliable evidence and are based upon faulty assumptions. Thus, the Court concludes that Defendants provide speculation, rather than evidence, which is insufficient to show that the amount in controversy exceeds $5,000,000. Lowdermilk, 479 F.3d at 1002.

Because neither the "four corners" of the complaint nor the Notice of Removal contain sufficient evidence concerning the amount in controversy, Defendants have not met their burden to establish this Court's jurisdiction. See Harris v. Bankers Life & Cas. Co., 425 F.3d 689, 694 (9th Cir. 2005). Thus, the Court has no confidence that the amount-in-controversy element of CAFA is met.

Finally, the Court declines to allow Defendants to reopen this motion to present additional evidence. Defendants' claim that they were unaware that Plaintiffs and the Court would want accurate information is troubling. Notably, Plaintiffs' motion to remand very much placed at issue the accuracy of the figures used by Defendants. Plaintiffs emphasized that they had requested accurate numbers and were rebuffed. Moreover, their moving papers encouraged Defendants repeatedly to bring forward real numbers in opposition to the motion but, once again, Defendants did not. Thus, Defendants' assertion that they were unaware of the need for accuracy in the figures they used, falls flat.

Accordingly, the Court recommends this action be remanded to Kern County Superior Court, for lack of federal subject matter jurisdiction. See 28 U.S.C. § 1447(c).

**IV. Findings and Recommendations**

Based upon the foregoing, the Court **RECOMMENDS**:

1. Plaintiff's motion for remand be **GRANTED**;
2. The matter be **REMANDED** to the Kern County Superior Court; and
3. Because the order remanding this matter to state court concludes this case, the Clerk of the Court be directed to close this matter.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within 14 days after being served with a copy, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and

1  Recommendations." Replies to the objections shall be served and filed within 7 days after service of
2  the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636
3  (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the
4  right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

6  IT IS SO ORDERED.

7  Dated:   **October 24, 2011**                                              **/s/ Jennifer L. Thurston**
                                                                              UNITED STATES MAGISTRATE JUDGE